# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **Francine Yates,** ) | |
| ) | |
| Plaintiff, ) | **08CV4566** |
| ) | **JUDGE GOTTSCHALL** |
| v. ) | **MAG. JUDGE BROWN** |
| ) | |
| **The Chicago Transit Authority** ) | |
| **The City of Chicago** ) | |
| **The State of Illinois** ) | |
| **Unicare Health Insurance** ) | |
| **Sedgwick CMS,** ) | |
| ) | |
| Defendants. ) | |

Complaint for Plaintiff – Francine Yates

RECEIVED

AUG 1 2 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Francine Yates
14114 S. Edbrooke Avenue
Chicago, IL  60827
(312) 351-5635
Pro Se

RECEIVED
Aug. 12, 2008
AUG 1 2 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## POINTS AND AUTHORITIES

775 ILCS 5/6-101 Part (B) Aiding and Abetting, Coercion……………………………………..….…..2

720 ILCS 5/31-4 Obstructing Justice………………………………………………………………..….2

720 ILCS 5/33-1 Bribery…………………………………………………………………………….....2

H.R. 985… … … … … … … … … … … … …..'… … … … … … … … … … … … … …..9

720 ILCS 5/46-1 Insurance Fraud. …………………………………………………………..…......9

720 ILCS 5/29B-1 Money Laundering. …………………………………………………….……..…10

720 ILCS 5/8 Conspiracy………………………………………………………………….…………10

The Illinois Human Rights Act (775 ILCS 5/1-102)…………………………………………………19

*42 U.S.C. § 12181–12189… … … … … … … … … … … … … … … … … …… … … … …19*

720 ILCS 5/11-9 Public Indecency…………………………………..……………………...…35

720 ILCS 5/11-20 Obscenity…………………………………………………………………….35

720 ILCS 5/12-7.4 Aggravated Stalking………………'……………………………...………...35

720 ILCS 5/33-3 Official Misconduct………………………………………………..…….……36

720 ILCS 5/ 26-1 Disorderly Conduct………………………………………………….….……36

## Case Law

*Jennings v. Southwood, 446 Mich. 125, 521 N.W.2d 230 (1994)*… … … … … … … … … … … … … …2

*Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893*… … … … … … … … … … … … … …6

*Ragsdale v. Wolverine World Wide, Inc,*… … … … … … … … … … … … … … … … … … … …17

*Cruzan v. Missouri Department of Health, 497 U.S. 261, 278 (1990).*… … … … … … … … … … …17

*Francine Yates v. The Chicago Transit Authority 2004CF2159, 21BA41078.*… … … … … … … …24

*Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority  06-3107.*… … … … … … … … … … … … … … … … … … … … … … … … …37

# I. BACKGROUND

This case is about the oppression of a young, single, African-American, mentally disabled woman who became homeless because of the ignorance, small-mindedness and stupidity of others. It is about a woman who helped pave the way for some and produce hope for others who have remained silent, waiting for management to arrest and bring a rest to their chaotic, hostile and disrespectful work environment. That woman's name is Francine Yates. Through perseverance, strength of character, tenacity, endurance and stamina, Francine Y. did the right thing by exposing the truth about what really goes on behind corporate walls. The plaintiff, Francine Yates (Francine Y.), fought for her civil rights by engaging in the protected activities of filing employment charges of discrimination in 2004, 2006 and 2007 against the Chicago Transit Authority, the City of Chicago and the Illinois Department of Human Rights. The retaliation against the plaintiff continued over a number of years and manifested itself in many forms. The plaintiff was even coerced into engaging in the act of insurance fraud. As a result, this case escalated into a high profile case because Francine Y. placed a call to the FBI under the direction of Patrick Fitzgerald's office. Because Francine Y. would not engage in fraud at the request of Mayor Richard Daley and his entourage, she has been belittled, mocked, ridiculed, coerced, harassed, sexually harassed, threatened, cyber-harassed, stalked, retaliated against, intimated by police officers, humiliated, placed under heavy surveillance, poisoned through an attempted drug-induced homicide, falsely arrested, wrongfully incarcerated, intentionally given a criminal background, and defamed as someone who is psychotic. The intent of the plaintiff's oppressors and harassers was to get the plaintiff to embezzle money from insurance claim funds and launder the funds into a remote, off-shore bank account or hold onto the embezzled portion for the conspirators in her private accounts.

1

Francine Y.'s, involvement in this case originated from the fact that she was coerced through willful indifference, conscious indifference and wantonness on behalf of Mayor Richard Daley and his entourage. Mayor Richard Daley and his entourage have consistently throughout time been personified as being "THE MAFIA." In *Jennings v. Southwood 446 Mich. 125, 521 N.W.2d 230 (1994),* the Supreme Court was asked to interpret the term "willful misconduct." The Court noted in passing that it is unfortunate that the judiciary and the Legislature have used the phrase "willful and wanton misconduct," as opposed to "willful or wanton misconduct" but concluded that the phrases "willful misconduct" and "willful and wanton misconduct" possess distinct meanings. The term "willful" requires a finding of actual intent to harm, the Court concluded, while the term "wanton" is an intent inferred from reckless conduct. Mayor Richard Daley and his entourage's intent was to inflict harm on the plaintiff. Their intent to do so was reckless and done with malice.

Because many individuals have perceived them as such, they have been coerced into breaking laws, aiding, abetting, impeding and obstructing justice. While many have been paid, bribed and threatened, others have surrendered their unannounced, active, and willful participation. Individuals have cringed at the thought and sound of Mayor Richard Daley's name. Some even hide from his presence. However, this innate perpetual fear that resides in the minds and hearts of these individuals is in and of itself a "false fear." *775 ILCS 5/6-101 Part (B) Aiding and Abetting; Coercion.* It is illegal to aid, abet, compel or coerce a person to commit any violation of the Human Rights Act. *720 ILCS 5/31-4 Obstructing Justice.* A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any

2

person, he knowingly commits any of the following acts: (a) Destroys, alters, conceals or disguises physical evidence, plants false evidence, furnishes false information.

## II. ARGUMENT AND DISCUSSION

### *Charge 1: Fraud, Fraudulent Practices, Conspiracy, Extortion & Bribery*

Fraud, in addition to being a criminal act, is also a type of civil law violation known as a tort. A tort is a civil wrong for which the law provides a remedy. A civil fraud typically involves the act of intentionally making a false representation of a material fact, with the intent to deceive, which is reasonably relied upon by another person to that person's detriment. A "false representation" can take many forms, such as: a false statement of fact, known to be false at the time it was made; a statement of fact with no reasonable basis to make that statement; a promise of future performance made with an intent, at the time the promise was made, not to perform as promised; a statement of opinion based on a false statement of fact; a statement of opinion that the maker knows to be false; or an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. "Special knowledge" in this case means knowledge or information superior to that possessed by the other party, and to which the other party did not have equal access.

Perjury is also an act of fraud. It is defined as the act of lying or making verifiably false statements on a material matter in a court of law or in any of various sworn statements in writing. It is important that the false statement be material to the case at hand, that it could affect the outcome of the case. Perjury is considered a serious offense as it can be used to usurp the power of the courts; resulting in miscarriages of justice; or as in the case of 1-06-3107, overt abortions

of justice. In the United States, the general perjury statute under Federal law provides for a prison sentence of up to five years.

The plaintiff just discovered in July of 2007, that the contracted vendor; Sedgwick CMS, and Unicare Health Insurance Company were active conspirators relating to the plaintiff's discrimination lawsuit. The plaintiff is not aware at this time if there are other acts of fraud being committed through the use of DBE contracting within the CTA. This would be a question for Pamela Beavers; General Manager of DBE/EEOC, as well as the contract and compliance group. Also, CTA switched from Martin Boyer to Sedgwick CMS to manage their workmen's compensation claims, FMLA claims and short-term disability claims.

The statue of limitations for fraud in the state of Illinois is five years. However, since Illinois is a first discovered state, the statue of limitations start running from the time that the act of fraud is discovered. Also, if the plaintiff was not mentally competent at the time the act of fraud was committed, the plaintiff's mental disabilities allow for the statue of limitations to become tolled. This means that they are granted a stay from expiring. The plaintiff has been afflicted with major depression and anxiety since December 2003. Her mental illnesses have heightened since the onset of additional trauma and an myriad number of acts of retaliation that have been afflicted against her.

The plaintiff; Francine Y., was diagnosed with anxiety and major depression in December of 2003. The plaintiff's illnesses are defined and protected under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. The Chicago Transit Authority and Sedgwick CMS were both aware of the plaintiff's illnesses because Paul Fish; Vice President of Capital

4

Investment, with the Chicago Transit Authority gave the plaintiff a referral to see a physician and removed her from service with the Chicago Transit Authority. The date of the memorandum was November 25, 2003. The plaintiff was placed on a medical leave of absence from December 2, 2003 to May 26, 2004. The plaintiff's illnesses were sustained from her work environment because of the retaliation and harassment associated with a sexual harassment lawsuit she filed. Also, Unicare Insurance was aware of the fact that the plaintiff was being treated for two mental illnesses because of the frequency with which the plaintiff used her medical insurance. While under the care of phsycians, Francine Y. was treated for high blood pressure, anxiety and major depression. When the plaintiff's short term disability benefit became exhausted, she returned to work the very next day which was May 27, 2004. However, she was fraudulently separated from employment with the Chicago Transit Authority because of two psychotic mental illnesses that she was intentionally diagnosed with. The plaintiff was fraudulently diagnosed with paranoia by Paul Fish and Dr.Kumar Moolayil. Paul Fish works for the Chicago Transit Authority and he is not a doctor. Francine Y. was diagnosed with schizophrenia by Dr. Ismael Angulo. Dr. Angulo works for the Chicago Transit Authority; however he is a primary health care physician but not a psychiatrist. This was done to conspire against the plaintiff because she engaged in the protected activities of opposing unlawful discrimination by filing a charge of discrimination with the appropriate legal authorities. The defendants were aware that the plaintiff sustained her disabilities within her work environment. However, CTA tried to defraud the plaintiff by denying her the right to file a workmen's compensation claim. The only way the plaintiff could have applied for workmen's compensation benefits was to have the forms given directly to her by her manager Ernest Payne. On November 6, 2003 when the plaintiff's nose started to severely bleed within CTA's workplace, she was denied the right to be released from work to go

5

to the emergency room for treatment. The plaintiff also asked her manager; Ernest Payne, for a workmen's compensation form. Francine Y. was intentionally ignored. The defendants remained willfully and consciously indifferent. As a result, the plaintiff called Sedgwick pursuant to Paul Fish's directions and requested a short-term disability form from Sedgwick. Francine Y. maintained contact with Sedgwick on a monthly basis while she was under her doctor's care from the period of December 2, 2003 through May 26, 2003. The plaintiff is not aware if bribery and extortion took place in an effort to get the parties to defraud the plaintiff.

On May 11, 2004 Sedgwick CMS sent the plaintiff a letter stating that she was being paid short term disability benefits and that the benefits would expire on May 26, 2004. Based on this information as well as the form that Francine Y. filled out when she first applied for her leave of absence, the plaintiff was made to believe that the entire six months of her leave of absence was being designated as short term disability. The plaintiff was a full-time exempt employee while she worked for the Chicago Transit Authority. The Chicago Transit Authority's policy for full time exempt employees in 2003 stated that they would be entitled to six months of pull pay when exercising the federal legally defined benefit of Short Term Disability. However, the plaintiff was defrauded when Paul Fish sent her a letter dated May 27, 2004. The letter stated that the plaintiff had exhausted her FMLA entitlement. The letter also stated that the plaintiff's short-term disability benefit had expired as well. Francine Y. received a second letter which accompanied the separation of service letter. That letter stated that Sedgwick CMS sent the plaintiff an Acknowledgement of Responsibilities letter which allowed the Chicago Transit Authority to designate the employee's sick time toward the Family Medical and Leave Act. Francine Y. became confused because she was under the impression that her leave of absence

6

was defined as short term disability and not FMLA.   The plaintiff was intentionally defrauded by the Chicago Transit Authority, the City of Chicago and Sedgwick CMS because they violated federal policy by not notifying the plaintiff in advance as to how her time off was being designated.  The Family Medical and Leave Act states that employers must provide a notice in writing within two days of learning of a request for a medical leave of absence. Francine Y. did not receive a notice in writing of how her time off was being designated until May 27, 2004. *Ragsdale v. Wolverine World Wide, Inc.*


Also, the plaintiff's healthcare produced a substantial burden for Unicare Healthcare Insurance because of the frequency with which she used her medical insurance for pshysician visits and to fill prescriptions.   The plaintiff was fraudulently separated from service on May 27, 2004 because the Chicago Transit Authority, the City of Chicago, Sedgwick CMS and Unicare Health Insurance conspired against the plaintiff because they did not want to assume the liability of paying the expenses associated with the plaintiff's healthcare which were sustained from her work environment.   This is evident because when the plaintiff was on her leave of absence between April 27, 2004 and May 27, 2004, she was treated at South Surburban Hospital for a pinched nerve in one of her elbows.  Because Unicare Health Insurance refused to pay out the claim, South Surburban Hospital sent the plaintiff the medical bill for the pinched nerve. Francine Y. contested the calim and placed a call to Unicare Health Insurance in an effort to resolve the dispute.  More than likely, Unicare Health Insurance was informed by CTA that the plaintiff was on a medical leave of absence from injuries sustained within her work environment. Because the injuries would have required medical care over a long period of time, the insurance

company was reluctant and refused to pay the bills.  As a result, they aided, abetted and conspired against the plaintiff along with Mayor Richard Daley and his entourage.

Lastly, a principle difference between working in an occupation and practicing a profession is the fiduciary responsibility that comes with that profession.  A fiduciary is a person or group of people who stand in a position of trust.  That trust represents a significant obligation to care for the interests of others.  Inherent in practicing as Presidents, Mayors, Governors, contracted human resource agencies and insurance companies is the fiduciary responsibility that authoritative persons or a group of persons in charge accept, placing the interests of others above themselves.  An agent is a person or group of persons who perform an act for another.  Inherent in this act is fiduciary responsibility and dual agency, which can also be referred to as mixed agency.  This is a situation where a person/authoritative figure performs or acts for two others.  The two people involved are the employee and the entity the agents are employed with.  The Chicago Transit Authority, the City of Chicago, the State of Illinois, Sedgwick CMS and Unicare Insurance failed as an agents acting on behalf of the plaintiff.  They did not fulfill their fiduciary responsibilities to the plaintiff; Francine Y.  Their intent to outwardly deceive, inflict pain and break the law was intentional and deliberate.  It was also done with malice.  They placed their own interests above the interests of an innocent, mentally disabled, homeless, single, African-American, Christian woman.  They were skilled in the law, but took no measure to use the law to protect, defend or assist the plaintiff.  The plaintiff; Francine Y., needed their help more than anything else.

The Chicago Transit Authority, the City of Chicago, the State of Illinois, Sedgwick CMS and Unicare Billing committed the workplace torts of intentional infliction of emotional distress, intentional infliction of mental distress and negligent intentional infliction of emotional and mental distress upon the plaintiff. A reckless disregard for the likelihood of causing the plaintiff distress occurred when the plaintiff was fraudulently separated from service with the Chicago Transit Authority for no valid legal reason. The plaintiff, Francine Y., was outraged when she discovered that she was being removed from service for fraudulent reasons mixed with the intent to conspire against her. Francine Y. was vulnerable because she was a woman who was mentally ill, single and without legal representation. The defendants were aware of all of these facts. The defendants were in a position of power, so they tried to take advantage of the plaintiff. Lastly, the CTA, the City of Chicago, the State of Illinois, Sedgwick CMS and Unicare Billing owed the plaintiff the fiduciary responsibility and duty of abiding by the Federal laws which govern them as employment institutions and giving the plaintiff's medical case an objective and ethical consideration based on all the substantial evidence and facts relating to her case. These actions; subsequent actions, and all other actions that followed made the plaintiff's emotional and mental distress greater than it was from the beginning. The plaintiff became deeply wounded, humiliated and severely traumatized. Francine Y.'s depression and anxiety became worse as she looked for full-time employment, remained ill, experienced homelessness and additional retaliation from Mayor Richard Daley and his entourage. The retaliation continued over a number of years and grew worst as the plaintiff was falsely arrested, wrongfully incarcerated, stalked, drug-induced, defamed as being a criminal and someone who is psychotic. *(See Exhibits in the Appendix Section)*

The **Whistleblower Enhancement Protection Act of 2007** prohibits retaliation against public employees who report official wrongdoing. The Whistleblower Act states that "a state or local government entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority. A federal agency violates the Whistleblower Protection Act if it takes, fails to take or threatens by failing to take a personnel action with respect to any employee or applicant because of any disclosure of information by the employee or applicant that he or she reasonably believes evidences a violation of a law, rule or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety. **H.R. 985 720 ILCS 32-2 Perjury.** (a) A person commits perjury when, under oath or affirmation, in a proceeding or in any other matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true. (b) Proof of Falsity. An indictment or information for perjury alleging that the offender, under oath, has made contradictory statements, material to the issue or point in question, in the same or in different proceedings, where such oath or affirmation is required, need not specify which statement is false. At the trial, the prosecution need not establish which statement is false. (c) Admission of Falsity. Where the contradictory statements are made in the same continuous trial, an admission by the offender in that same continuous trial of the falsity of a contradictory statement shall bar prosecution therefore under any provisions of this Code. (d) A person shall be exempt from prosecution under subsection (a) of this Section if he is a peace officer who uses a false or fictitious name in the enforcement of the criminal laws, and such use is approved in writing as provided in Section 10-1 of "The Liquor Control Act of 1934", as amended, Section 5

10

of "An Act in relation to the use of an assumed name in the conduct or transaction of business in this State", approved July 17, 1941, as amended, or Section 2605-200 of the Department of State Police Law (**20 ILCS 2605/2605-200**).  However, this exemption shall not apply to testimony in judicial proceedings where the identity of the peace officer is material to the issue, and he is ordered by the court to disclose his identity.  (e) Sentence.  Perjury is a Class 3 felony punishable for up to five years.  **720 ILCS 5/46-1 Insurance Fraud.**  (a) A person commits the offense of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.  **720 ILCS 5/29B-1 Money Laundering.** (a) A person commits the offense of money laundering: 1.5) when he or she transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument: (A) with the intent to promote the carrying on of the unlawful activity from which the criminally derived property was obtained; or (B) knowing, or having reason to know, that the financial transaction is designed in whole or in part:  i) to conceal or disguise the nature, the location, the source, the ownership or the control of the criminally derived property; or ii) to avoid a transaction reporting  requirement under State law; or  (2) when, with the intent to: (A) promote the carrying on of a specified  criminal activity as defined in this Article; or (B) conceal or disguise the nature, location,  source, ownership, or control of property believed to be the proceeds of a specified criminal activity as defined by subdivision (b)(6).     **Extortion, Outwresting**, or **Exaction** is a criminal offense, which occurs, when a person unlawfully obtains either money, property or services from a person, entity, or

11

institution, through coercion. Refraining from doing harm is sometimes euphemistically called *protection*. Extortion is commonly practiced by organized crime groups. The actual obtainment of money or property is not required to commit the offense. Making a threat of violence or a lawsuit which *refers* to a requirement of a payment of money or property to halt future violence or lawsuit is sufficient to commit the offense. Exaction refers not only to extortion or the unlawful demanding and obtaining of something through force, additionally, exact in its formal definition means the infliction of something such as pain and suffering or to make somebody endure something unpleasant. In the United States, extortion may also be committed as a federal crime across a computer system, phone, by mail or in using any instrument of "interstate commerce". Extortion requires that the individual sent the message "willingly" and "knowingly" as elements of the crime. The message only has to be sent (but does not have to reach the intended recipient) to commit the crime of extortion. Extortion is distinguished from blackmail. In blackmail, the blackmailer threatens to do something which would be legal or normally allowed. **720 ILCS 5/33-1 Bribery.** A person commits bribery when with intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (b) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to one whom he believes to be a public officer, public employee, juror or witness, any property or personal advantage which a public officer, public employee, juror or witness would not be authorized by law to accept; or (c) With intent to cause any person to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that

person any property or personal advantage which he is not authorized by law to accept; or (d) He receives, retains or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or (e) He solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness. (f) Sentence. Bribery is a Class 2 felony. **720 ILCS 5/29A-2 Accepting a Bribe.** An employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs. **720 ILCS 5/29A-2 Commercial Bribe Receiving.** An employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs.


### *Charge 2:  Discrimination/Basis:  Disability = Major Depression & Anxiety*
The plaintiff; Francine Y., was diagnosed with anxiety and major depression in December of 2003. The plaintiff's illnesses are defined and protected under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. The Chicago Transit Authority and Sedgwick CMS were both aware of the plaintiff's illnesses because Paul Fish; Vice President of Capital Investment, with the Chicago Transit Authority gave the plaintiff a referral to see a physician and

13

removed her from service with the Chicago Transit Authority. The date of the memorandum was November 25, 2003. The plaintiff was placed on a medical leave of absence from December 2, 2003 to May 26, 2004. The plaintiff's illnesses were sustained from her work environment because of the retaliation and harassment associated with a sexual harassment lawsuit she filed. Also, Unicare Insurance was aware of the fact that the plaintiff was being treated for two mental illnesses because of the frequency with which the plaintiff used her medical insurance. While under the care of phsycians, Francine Y. was treated for high blood pressure, anxiety and major depression. When the plaintiff's short term disability benefit became exhausted, she returned to work the very next day which was May 27, 2004. However, she was fraudulently separated from employment with the Chicago Transit Authority because of two psychotic mental illnesses that she was intentionally diagnosed with. The plaintiff was fraudulently diagnosed with paranoia by Paul Fish and Dr.Kumar Moolayil. Paul Fish works for the Chicago Transit Authority and he is not a doctor. Francine Y. was diagnosed with schizophrenia by Dr. Ismael Angulo. Dr. Angulo works for the Chicago Transit Authority; however he is a primary health care physician but not a psychiatrist. This was done to conspire against the plaintiff because she engaged in the protected activities of opposing unlawful discrimination by filing a charge of discrimination with the appropriate legal authorities. Because the plaintiff was discriminated against and separated from employment with the CTA because of her disabilities, the defendants broke the law. They segregated her by stating that she was unfit to be an employee with CTA based upon fraudulent disabilities that they diagnosed her with. The ADA prohibits employers from discriminating against qualified applicants in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions, and privileges of employment.

The defendants were aware that the plaintiff sustained her disabilities within her work environment. However, CTA tried to defraud the plaintiff by denying her the right to file a workmen's compensation claim. The only way the plaintiff could have applied for workmen's compensation benefits was to have the forms given directly to her by her manager Ernest Payne. On November 6, 2003 when the plaintiff's nose started to severely bleed within CTA's workplace, she was denied the right to be released from work to go to the emergency room for treatment. The plaintiff also asked her manager; Ernest Payne, for a workmen's compensation form. Francine Y. was intentionally ignored. The defendants remained willfully and consciously indifferent. As a result, the plaintiff called Sedgwick CMS pursuant to Paul Fish's directions and requested a short-term disability form from Sedgwick CMS. Francine Y. maintained contact with Sedgwick on a monthly basis while she was under her doctor's care from the period of December 2, 2003 through May 26, 2004. The plaintiff is not aware if bribery and extortion took place in an effort to get the parties to defraud the plaintiff.

On May 11, 2004 Sedgwick CMS sent the plaintiff a letter stating that she was being paid short term disability benefits and that the benefits would expire on May 26, 2004. Based on this information as well as the form that Francine Y. filled out when she first applied for her leave of absence, the plaintiff was made to believe that the entire six months of her leave of absence was being designated as short term disability. The plaintiff was a full-time exempt employee while she worked for the Chicago Transit Authority. The Chicago Transit Authority's policy for full time exempt employees in 2003 stated that they would be entitled to six months of pull pay when exercising the federal legally defined benefit of Short Term Disability. However, the plaintiff was defrauded when Paul Fish sent her a letter dated May 27, 2004. The letter stated that the

plaintiff had exhausted her FMLA entitlement. The letter also stated that the plaintiff's short-term disability benefit had expired as well. Francine Y. received a second letter which accompanied the separation of service letter. That letter stated that Sedgwick CMS sent the plaintiff an Acknowledgement of Responsibilities letter which allowed the Chicago Transit Authority to designate the employee's sick time toward the Family Medical and Leave Act. Francine Y. became confused because she was under the impression that her leave of absence was defined as short term disability and not FMLA. The plaintiff was intentionally defrauded by the Chicago Transit Authority, the City of Chicago and Sedgwick CMS because they violated federal policy by not notifying the plaintiff in advance as to how her time off was being designated. The Family Medical and Leave Act states that employers must provide a notice in writing within two days of learning of a request for a medical leave of absence. Francine Y. did not receive a notice in writing of how her time off was being designated until May 27, 2004. _Ragsdale v. Wolverine World Wide, Inc._

Also, the plaintiff's healthcare produced a substantial burden for Unicare Healthcare Insurance because of the frequency with which she used her medical insurance for pshysician visits and to fill prescriptions. The plaintiff was fraudulently separated from service on May 27, 2004 because the Chicago Transit Authority, the City of Chicago, Sedgwick CMS and Unicare Health Insurance conspired against the plaintiff because they did not want to assume the liability of paying the expenses associated with the plaintiff's healthcare which were sustained from her work environment. This is evident because when the plaintiff was on her leave of absence between April 27, 2004 and May 27, 2004, she was treated at South Surburban Hospital for a pinched nerve in one of her elbows. Because Unicare Health Insurance refused to pay out the

claim, South Surburban Hospital sent the plaintiff the medical bill for the pinched nerve. Francine Y. contested the calim and placed a call to Unicare Health Insurance in an effort to resolve the dispute. More than likely, Unicare Health Insurance was informed by CTA that the plaintiff was on a medical leave of absence from injuries sustained within her work environment. Because the injuries would have required medical care over a long period of time, the insurance company was reluctant and refused to pay the bills. As a result, they aided, abetted and conspired against the plaintiff along with Mayor Richard Daley and his entourage.

The plaintiff was discriminated against because of her disabilities because she was treated differently than other, similarly situated employees within CTA's work environment. Steven Byk is a white male employee who has at least one disability which is defined and protected under the Americans with Disabilities Act. He was not separated from service because of his disability nor was he treated as if he was psychotic and dangerous because of his disability. He remains on CTA's payroll as an active employee and the medical insurance company continues to cover his healthcare. There are other employees who are probably using their medical insurance for pshyscian visits as well as medication. Those individuals might be Ron Cabai and Angela King. Angela King was also a behind the scene conspirator because she was instrumental in having the defendants diagnose the plaintiff with paranoia. She was seen mocking the plaintiff about being crazy and Francine Y. filed an internal EEOC complaint against her. She was one the of main conspirators who was primarily responsible for the plaintiff being diagnosed with paranoia.

Francine Y. was denied the right to return to work and perform her essential job responsibilities because she was given two fraudulent psychotic mental illnesses which she does not have.

17

Because CTA conspired and caused the plaintiff to be diagnosed with these mental illnesses, she was intentionally perceived to be dangerous and was not allowed to continue as an employee with the Chicago Transit Authority. This harmed the plaintiff because CTA intentionally broke the law when they segregated the plaintiff because of her illnesses. Francine Y. lost her income, her medical benefits were taken away and the CTA conspired further and tried to deny the plaintiff her right to receive unemployment benefits. *Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893.* The Chicago transit authority discriminated against the plaintiff by segregating her because of her disabilities which were sustained from her work environment. Eventually, CTA wanted to segregate the plaintiff further by having her removed from society altogether and placed within a mental institution. *Cruzan v. Missouri Department of Health, 497 U.S. 261, 278 (1990).* *(See Exhibits in Appendix Section)*

**The Americans with Disabilities Act of 1990 (ADA)** prohibits discrimination on the basis of disabilities in employment, state and local government, public accommodations, commercial facilities, transportation, and telecommunications. The ADA also prohibits private employers, state and local governments, employment agencies and labor unions from discriminating against qualified individuals with disabilities in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions, and privileges of employment. The ADA covers employers with fifteen or more employees, including state and local governments. It also applies to employment agencies, labor organizations and to the United States Congress. To be protected by the ADA, one must have a disability or have a relationship or association with an individual with a disability. An individual with a disability is defined by the ADA as a person who has a physical or mental impairment that substantially limits one or more major life activities, a person who has a history or record of such an impairment, or a person who is

18

perceived by others as having such an impairment. Major life activities are activities that an average person can perform with little or no difficulty such as walking, breathing, seeing, hearing, speaking, learning, and working. A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question. An employer is required to make a reasonable accommodation to the known disability of a qualified applicant or employee if it would not impose an "undue hardship" on the operation of the employer's business. Reasonable accommodations may include, but are not limited to making existing facilities used by employees readily accessible to and usable by persons with disabilities; job restructuring, modifying work schedules, reassignment to a vacant position; acquiring or modifying equipment or devices, adjusting or modifying examinations, training materials, or policies and providing qualified readers or interpreters. An undue hardship is defined as an action requiring significant difficulty or expense when considered in light of factors such as an employer's size, financial resources, and the nature and structure of its operations. *42 U.S.C. § 12111–12117.* **Title II of the ADA** has two sections. These sections relate to public services and public transportation. Both sections state that a "public entity" can be any state or local government or any department or agency thereof. The lack of accessibility or certain services can be considered discrimination, regardless of who it actually affects. The first section covers public agencies (local, county, state, etc., government and their units). That section generally requires the agencies to comply with regulations similar to **Section 504 of the Rehabilitation Act.** These rules cover access to all programs offered by the entity. Access includes physical access described in the Uniform Federal Accessibility Standards or the ADA Standards for Accessible Design and access that might be obstructed by discriminatory policies or procedures of the entity. The other section of Title II is specific to

19

public transportation provided by public entities. This section requires the provision of paratransit services by public entities. *42 U.S.C. § 12131–12165.* Under **Title III of the ADA**, no individual may be discriminated against on the basis of disability with regards to the full and equal enjoyment of the goods, services, facilities, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. "Public accommodations" include most places of lodging such as hotels, recreation, transportation, education, dining, stores, care providers, and places of public displays, among other things. *42 U.S.C. § 12181–12189.* **The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the basis of race, color, sex, national origin, disability or religion. **Title I of the American with Disabilities Act** states that it is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding or litigation under the Americans with Disabilities Act.

### *Charge 3: Harassment/Basis: Gender*
The plaintiff; Francine Y. is a female employee who complained about the harassment she was experiencing in CTA's workplace by Ernest Payne. Edmund Oparah is a male, similarly situated

employee who complained about Ernest Payne as well. Edmund complained to Francine Y. several times during business hours within CTA's work environment about the abuse and harassment that he was being subjected to by Ernest Payne. Some days the harassment became so intolerable, Edmund cried in front of Francine Y. and she gave him a Kleenex. Edmund Oparah was granted a transfer off of Ernest Payne's team, the plaintiff; Francine Y. was not. Edmund Oparah has not been harassed or retaliated against in the magnitude of Francine Y. He was not fraudulently separated from service, he was not diagnosed with fraudulent psychotic mental illnesses, he was not stalked, ridiculed, mocked, placed under heavy surveillance, threatened, poisoned through the use of an attempted drug-induced homicide, cyber harassed, cyber sexually harassed, sent an illegal search warrant to have his storage lockers illegally accessed, fraudulently given a criminal background or falsely arrested. Other incidences of harassment included: Miriam Martinez harassing the plaintiff about eating chicken, cloning herself with the attributes of others, harassing the plaintiff about contracting diabetes, constantly watching the plaintiff, keeping the plaintiff under heavy surveillance, following and stalking the plaintiff, reporting on the plaintiff, placing the green leg of a dangerous bird in the plaintiff's path, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, mocking the plaintiff about mentally ill, mocking the plaintiff about not having an attorney, mocking the plaintiff about being fat, telling the plaintiff that she would end up dead on the side of a road, mocking the plaintiff about having large breasts, slandering the plaintiff about being Ronald Huberman's lover and harassing the plaintiff for not having money. When Miriam Martinez made references to eating chicken and having diabetes, she stereotyped the plaintiff as being black. However, Francine Y. is bi-racial, she eats other foods besides chicken and she does not have diabetes. The other officer; Nassira Tokash,

21

harassed the plaintiff by watching her, keeping the plaintiff under heavy surveillance, wearing similar cotton panties, displaying her nudity from the waist up, wearing a similar bandanna, carrying a Whole Foods bag the next day after the plaintiff was seen with one, carrying a blackberry telephone and a pink razor blade into the dormitory area when she was forbidden by the staff to do so, cloning herself with the attributes of others, stalking and following the plaintiff, placing the green leg of a dangerous bird in the plaintiff's path, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, forging a false domestic battery, staging a false arrest, not showing up in court, lying on the plaintiff, telling the plaintiff that she needs to loose weight, telling the plaintiff that she needs to change her pants, telling Francine Y. that she sits around all day and does nothing and mocking her that she did not have any money. Nassira Tokash also mocked the plaintiff on May 25, 2008 by saying, "I want you out, out in the morning and then you will see." The argument started because the plaintiff stated that she knew Spanish and French. It intensified and the plaintiff told the officer that she needed to find a cosmetic surgeon to fix her feet. The heels of the officer's feet were badly damaged and the plaintiff made mental notes to use them as identifying marks. Francine Y. also stated that she was not going to embezzle any money. Nassira Tokash became angry and placed a call on her blackberry, told vicious lies and staged a false arrest the very next day. Miriam Martinez and Nassia Tokash are both Mexicans. There have been a lot of factual issues reported where Mexicans have been intentionally discriminating against blacks. Many of them are developing a growing perpetual hatred against blacks because they feel as if they are competing for jobs. Also, individuals have made the plaintiff aware that one of the initiation processes to become a Latin King is to kill a black female. This is racial hatred and it is also murder.

22

Some other issues of harassment consisted of Officer Melchor harassing the plaintiff by yelling at her to get into the police car, to shut up when she was asking questions and trying to explain that it was a false arrest, issuing a false police report, snatching the plaintiff's bag, harassing the plaintiff about her weight, mocking the plaintiff that her driver's license had expired and that she was arrested on her birthday. The plaintiff's bag had pens in it because it was broken and the plaintiff's hand was scraped against the pen when officer Melchor snatched the bag. Francine Y. showed officer Melchor her hands, but no one gave her a band-aid or sent her to Stroger's hospital to receive medical attention. He claimed that her hands had been chewed on. He placed the plaintiff in a cell with a female which had not been handcupped. As a result, he did nothing to help the plaintiff but ignored her by remaining willfully indifferent. While being processed, a black female officer that frisked the plaintiff mocked the plaintiff because she made a statement about God. A second, young black female told the black officer that frisked the plaintiff to check off "did not respond" to a question while she was filling out paperwork relating to the plaintiff. This is fraud. The plaintiff became angry and made both officers aware that she did in fact respond to the question. The officer making the report quickly changed it. Another, fat, black female officer put the plaintiff's glasses on the table when she was instructed to put them in the paper eyeglass holder. The plaintiff was also visually impaired and needed her glasses to see. Her glasses were taken away from her when she was wrongfully incarcerated and placed into a holding cell.

Lastly, on June 30, 2008, the plaintiff came to the 17th and State police station to retrieve a copy of the police report from the false arrest which was never given to her. She also wanted to file a

complaint against Kenyatta. Kenyatta is a black, female homeless woman who assisted Nassira Tokash with the false arrest on May 26, 2008. The plaintiff mentioned to officer King that Kenyatta was supposedly on the run for something she did in Texas. She asked if they would arrest her. He replied, "no" because other officers were watching and they coerced him into lying. The plaintiff was not allowed to fill out a police report against Kenyatta nor was she given a copy of the police report that was made against her on May 26, 2008. A black female officer went through a door behind the complaint desk and brought out between twenty and fourty police officers. The officers were primarily white and male. There were also black officers as well as female officers. They intimidated the plaintiff by surrounding her and staring at her when she came to the station on June 30, 2008 to retrieve a copy of the police report. The officer's physical proximity in relation to where the plaintiff was standing was such of a nature that the plaintiff felt her physical safety was threatened within an environment which should have been conducive to safety and protecting the innocent.

**The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are

24

condemned. **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the basis of race, color, sex, national origin, disability or religion. *Francine Yates v. The Chicago Transit Authority, 2004CF2159 21BA41078.* *(See Exhibits in Appendix Section)*

### *Charge 4:  Harassment/Basis:  Race;  Ethnicity = Black, African-American*

The plaintiff; Francine Y., is a black, female employee who complained about the harassment she was experiencing in CTA's workplace by Ernest Payne. Bernadine Majewski is a white, similarly situated female employee, who complained about Ernest Payne as well. Bernadine Majewski was granted a transfer from off of Ernest Payne's team; the plaintiff, Francine Y. was not. Bernadine has not been harassed or retaliated against in the magnitude of Francine Y. Bernadine Majewski was not fraudulently separated from service, she was not diagnosed with fraudulent psychotic mental illnesses, made to become homeless, followed and stalked, ridiculed, mocked, placed under heavy surveillance, threatened, poisoned through the use of an attempted drug-induced homicide, cyber harassed, sexually harassed, harassed, sent an illegal search warrant to have her storage locker searched, falsely arrested or given a fraudulent criminal background. The harassment consisted of Ronald Huberman sending the plaintiff between 150-300 junk emails per day and having others inside and outside of the PGM homeless facility to harass the plaintiff as well. Ronald Huberman is a bi-racial Jewish male. There has been a great deal of animosity stemming from the Jewish disregard for blacks because of the bondage that they were forced into while Pharaoh was king of Egypt. That incident has nothing to do with African-Americans. African-Americans are one of the most hated groups of people on the face of the earth. Other incidences of harassment included Miriam Martinez harassing the plaintiff about eating chicken, harassing the plaintiff about contracting diabetes, constantly watching the plaintiff, following and stalking the plaintiff, placing the plaintiff under heavy surveillance,

reporting on the plaintiff, placing the green leg of a dangerous bird in the plaintiff's path, telling the plaintiff that she would end up dead on the side of a road, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, mocking the plaintiff about being mentally ill, mocking the plaintiff about not having an attorney, mocking the plaintiff about being fat, mocking the plaintiff about having large breasts, slandering the plaintiff about being Ronald Huberman's lover, selling the plaintiff out for pennies, nickels, dimes and harassing the plaintiff for not having money.    When Miriam Martinez made references to eating chicken and having diabetes, she stereotyped the plaintiff as being black.  However, Francine Y. is bi-racial, she eats other foods besides chicken and she does not have diabetes.  Nassira Tokash harassed the plaintiff by watching her, wearing similar cotton panties, displaying her nudity from the waist up, wearing a similar bandanna, carrying a Whole Foods bag the day after the plaintiff was seen carrying one, stalking and following the plaintiff, keeping the plaintiff under heavy surveillance, placing the green leg of a dangerous bird in the plaintiff's path, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, forging a false domestic battery, not showing up in court, mocking the plaintiff about being mentally ill, carrying a razor blade and a cellular telephone in the dormitory when they were forbidden by the staff,  staging a false arrest, lying on the plaintiff, telling the plaintiff that she needs to stop eating for two months to loose weight, telling the plaintiff that she needs to change her pants, telling the plaintiff that she sits around all day and does nothing, selling the plaintiff out for pennies, nickels, dimes and telling the plaintiff that she did not have any money.  Nassira Tokash  mocked the plaintiff on May 25, 2008 by saying, " I want you  out, out in the morning and then you will see."  The argument started because the plaintiff stated that she knew Spanish and French.  It intensified and the

plaintiff told the officer that she needed to find a cosmetic surgeon to fix her feet. The officer's feet were badly damaged, so the plaintiff made mental notes to use them as identifying marks. The plaintiff also stated that she was not going to embezzle any money. Nassira Tokash became angry and placed a call on her blackberry, told vicious lies and staged a false arrest the next day.

Miriam Martinez and Nassia Tokash are both Mexicans. There have been a lot of factual issues reported where Mexicans have been intentionally discriminating against blacks. Many of them are developing a growing perpetual hatred against blacks because they feel as if they are competing for jobs. Also, individuals have made the plaintiff aware that one of the initiation processes to become a Latin King is to kill a black female. This is racial hatred and it is also murder.

Another issue of harassment consisted of officer Melchor harassing the plaintiff by yelling at her to get into the police car, to shut up when she was asking questions and trying to explain that it was a false arrest, issuing a false police report, snatching the plaintiff's bag, harassing her about her weight, mocking the plaintiff that her driver's license had expired and that she was arrested on her birthday. Also, the plaintiff's bag had pens in it because it was broken and the plaintiff's hand was scraped against the pen when officer Melchor snatched the bag. Francine Y. showed officer Melchor her hands, but no one gave her a band-aid or sent her to Stroger's hospital to receive medical attention. He claimed that her hands had been chewed on. As a result, he did nothing to help the plaintiff but ignored her by remaining willfully indifferent. Lastly, on June 30, 2008, the plaintiff came to the 17th and State police station to retrieve a copy of the police report from the false arrest which was never given to her. She also wanted to file a complaint

27

against Kenyatta. Kenyatta is a black homeless woman who assisted Nassira Tokash with the false arrest on May 26, 2008. The plaintiff mentioned to officer King that Kenyatta was supposedly on the run for something she did in Texas. She asked if they would arrest her. He replied, "no" because other officers were watching him and they coerced him into lying. The plaintiff was not allowed to fill out a police report against Kenyatta nor was she given a copy of the report that was made against her on May 26, 2008. A black female officer went through a door behind the complaint desk and brought out between twenty and fourty police officers. The officers were primarily white and male. There were also black officers as well as female officers. They intimidated the plaintiff by surrounding her and staring at her when she came to the station on June 30, 2008 to retrieve a copy of the report. The officer's physical proximity in relation to where the plaintiff was standing was such of a nature that the plaintiff felt her physical safety was threatened within an environment which should have been conducive to safety and protecting the innocent.

**The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are

28

condemned. . **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the basis of race, color, sex, national origin, disability or religion. *Francine Yates v. The Chicago Transit Authority, 2004CF2159 21BA41078.* *(Sée Exhibits in Appendix Section)*

### Charge 5: Harassment/Basis: Marital Status = Single, Unmarried

The plaintiff; Francine Y., is single female employee who complained about the harassment she was experiencing in CTA's workplace by Ernest Payne. The defendants had knowledge of the plaintiff's marital status. Edmund Oparah is a married male, similarly situated employee, who complained about Ernest Payne as well. He was granted an interdepartmental transfer to another team within the Capital Investment Department. The plaintiff was not. Edmund Oparah has not been harassed or retaliated against in the magnitude of Francine Y. Edmund Oparah was not fraudulently separated from service, he was not diagnosed with fraudulent psychotic mental illnesses, made to become homeless, followed and stalked, ridiculed, mocked, placed under heavy surveillance, threatened, poisoned through the use of an attempted drug-induced homicide, cyber harassed, sexually harassed, harassed, sent an illegal search warrant to have his storage locker searched, falsely arrested or given a fraudulent criminal background. The harassment consisted of Ronald Huberman sending the plaintiff between 150-300 junk emails per day and having others inside and outside of the PGM homeless facility to harass the plaintiff as well. Ronald Huberman is also a single male employee with the CTA. Other incidences of harassment included Miriam Martinez harassing the plaintiff about eating chicken, harassing the plaintiff about contracting diabetes, constantly watching the plaintiff, following and stalking the plaintiff, placing the plaintiff under heavy surveillance, reporting on the plaintiff, placing the green leg of a dangerous bird in the plaintiff's path, telling the plaintiff that she would end up dead on the side of a road, poisoning and attempting to kill the plaintiff through the use of a drug-induced

homicide, using a fictitious name and identity, mocking the plaintiff about being mentally ill, mocking the plaintiff about not having an attorney, mocking the plaintiff about being fat, mocking the plaintiff about having large breasts, slandering the plaintiff about being Ronald Huberman's lover, selling the plaintiff out for pennies, nickels, dimes and harassing the plaintiff for not having money. When Miriam Martinez made references to eating chicken and having diabetes, she stereotyped the plaintiff as being black. However, Francine Y. is bi-racial, she eats other foods besides chicken and she does not have diabetes. Nassira Tokash harassed the plaintiff by watching her, wearing similar cotton panties, displaying her nudity from the waist up, wearing a similar bandanna, carrying a Whole Foods bag the day after the plaintiff was seen carrying one, stalking and following the plaintiff, keeping the plaintiff under heavy surveillance, placing the green leg of a dangerous bird in the plaintiff's path, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, forging a false domestic battery, not showing up in court, mocking the plaintiff about being mentally ill, carrying a razor blade and a cellular telephone in the dormitory when they were forbidden by the staff, staging a false arrest, lying on the plaintiff, telling the plaintiff that she needs to stop eating for two months to loose weight, telling the plaintiff that she needs to change her pants, telling the plaintiff that she sits around all day and does nothing, selling the plaintiff out for pennies, nickels, dimes and telling the plaintiff that she did not have any money. Nassira Tokash  mocked the plaintiff on May 25, 2008 by saying, " I want you  out, out in the morning and then you will see." The argument started because the plaintiff stated that she knew Spanish and French. It intensified and the plaintiff told the officer that she needed to find a cosmetic surgeon to fix her feet. The officer's feet were badly damaged, so the plaintiff made mental notes to use them as identifying marks. The plaintiff also stated that she was not going to

embezzle any money. Nassira Tokash became angry and placed a call on her blackberry, told vicious lies and staged a false arrest the next day.

Miriam Martinez and Nassia Tokash are both Mexicans. There have been a lot of factual issues reported where Mexicans have been intentionally discriminating against blacks. Many of them are developing a growing perpetual hatred against blacks because they feel as if they are competing for jobs. Also, individuals have made the plaintiff aware that one of the initiation processes to become a Latin King is to kill a black female. This is racial hatred and it is also murder.

Another issue of harassment consisted of officer Melchor harassing the plaintiff by yelling at her to get into the police car, to shut up when she was asking questions and trying to explain that it was a false arrest, issuing a false police report, snatching the plaintiff's bag, harassing her about her weight, mocking the plaintiff that her driver's license had expired and that she was arrested on her birthday. Also, the plaintiff's bag had pens in it because it was broken and the plaintiff's hand was scraped against the pen when officer Melchor snatched the bag. Francine Y. showed officer Melchor her hands, but no one gave her a band-aid or sent her to Stroger's hospital to receive medical attention. He claimed that her hands had been chewed on. As a result, he did nothing to help the plaintiff but ignored her by remaining willfully indifferent. Lastly, on June 30, 2008, the plaintiff came to the 17th and State police station to retrieve a copy of the police report from the false arrest which was never given to her. She also wanted to file a complaint against Kenyatta. Kenyatta is a black homeless woman who assisted Nassira Tokash with the false arrest on May 26, 2008. The plaintiff mentioned to officer King that Kenyatta was

supposedly on the run for something she did in Texas. She asked if they would arrest her. He replied, "no" because other officers were watching him and they coerced him into lying. The plaintiff was not allowed to fill out a police report against Kenyatta nor was she given a copy of the report that was made against her on May 26, 2008. A black female officer went through a door behind the complaint desk and brought out between twenty and fourty police officers. The officers were primarily white and male. There were also black officers as well as female officers. They intimidated the plaintiff by surrounding her and staring at her when she came to the station on June 30, 2008 to retrieve a copy of the report. The officer's physical proximity in relation to where the plaintiff was standing was such of a nature that the plaintiff felt her physical safety was threatened within an environment which should have been conducive to safety and protecting the innocent.

**The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. . **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the

32

basis of race, color, sex, national origin, disability or religion.  *Francine Yates v. The Chicago*

*Transit Authority, 2004CF2159 21BA41078.*  *(See Exhibits in Appendix Section)*

### Charge 6:  Sexual Harassment, Obscenity, Indecent Exposure/Basis:  Gender

Francine Y. is a female.  Because the defendants conspired against her, she suffered additional

forms of sexual harassment relating to the original employment discrimination lawsuit.  She has

been sexually cyber-harassed by Ronald Huberman because she would not willfully engage in

the acts of embezzlement and money laundering.'  Ronald Huberman; a male CTA employee, has

sent several sexually explicit emails to the plaintiff.  He also had a police officer with the

fraudulent name of Miriam Martinez to place the green leg of a dangerous bird in the plaintiff's

path while she was on her way to look for work.  There is a sexual harassment law which states

that a dangerous animal contributes to a hostile working environment.  Looking for work does

constitute a working environment.  Also, one female police officer; Miriam Martinez,  made a

comment in December of 2007 that she would rather have smaller breasts than to have the big

breasts that Francine Y. has.  Miriam Martinez was an active duty police officer during the time

she perpetrated a homeless person while living at the Pacific Garden Mission.  She engaged in

the acts of sexual harassment, official misconduct and disorderly conduct.  Miriam Martinez also

engaged in the acts of public indecency and obscenity by raising her shirt up and showing the

plaintiff her grotesque looking stretch marks on her abdomen.  The exposure was made in

PGM's public hallway when the plaintiff was proceeding toward the line to go down for

breakfast.  Hopefully it was not done to entice the plaintiff because Francine Y. is a 100%

heterosexual.  The plaintiff never encouraged this behavior, but remained willfully indifferent by

walking pass the officer.  Nassira Tokash sexually harassed the plaintiff by repeatedly wearing

similar cotton panties in an effort to mock her.  Nassira Tokash also walked through the

33

changing area displaying her nudity from the waist up. The was done to mock one of the homeless women who was more than likely a drug addict and possibly afflicted with a mental illness as well. It was also used as an act of obscenity and indecent exposure to entice lesbians. The Pacific Garden Mission has a rule that the women cannot disrobe or dress in the bunk area. The mission also stated that the guests need to cover their nudity with a towel when proceeding from the changing area to the showers. Nassira Tokash was an active duty police officer during the time she perpetrated a homeless person while living at PGM. She engaged in the acts of sexual harassment, indecent exposure, obscenity, official misconduct and disorderly conduct. The plaintiff is a 100% heterosexual. Francine Y. and many other women complained to the staff at the PGM homeless facility about the sexual advances and innuendos they were subjected to by other women living in the mission because they became offended by their actions. Another act of sexual harassment was performed when the plaintiff was being processed after the false arrest. Francine Y. was asked by officer Melchor to give her identifying features or marks. The plaintiff stated that she has pretty eyes and large breasts. While the plaintiff was being processed, three black male officers watched and made sexually explicit remarks to the plaintiff. These officers were officer Doyle, officer Melchor and officer Hayes. They were laughing and stated, "that's right with those big ass titties (meaning breasts) and that big ass." The plaintiff told the officers that she did not play that. Lastly, while the plaintiff was being frisked by a Mexican, female police officer, the officer reached and placed her hand under the plaintiff's bra and felt all around the rim of it, rubbing up against the plaintiff's breasts. She stated, "oh, you have on a wire frame bra." The officer also touched the plaintiff in a way which felt sexual in nature. The female police officer amused herself by raising the plaintiff's shirt up while she frisked her. Officer Melchor stood up so that he could get a good look through the glass. The

plaintiff told the female police officer while being frisked that officer Melchor was watching through the glass window. She asked the officer if she could stop raising up her shirt because officer Melchor could see through the glass window. It was as if the officers performed this routine on a daily basis when women came in to be processed. Officers Dolye and Hayes came out of nowhere prepared to watch what appeared to be a routine show that was reenacted on a daily basis. The show included sexual harassment, harassment, mockery, ridicule and inappropriate laughing with the use of a female police officer assisting and aiding them. Lastly, another act of sexual harassment that Ronald Huberman subjected the plaintiff to was the fact that he instructed a white, male doctor to examine the plaintiff in the emergency room at Stroger's hospital. The doctor engaged in a single malicious act of sexual harassment by pulling back the plaintiff's inner and outer labia flaps around her vagina with his hand in an effort to insert a metal object for a pap smear. He also asked Francine Y. if she had ever had an abortion or a miscarriage before. Before the exam, the plaintiff complained to the doctor about a stomach ache. She thought she might have still been ill from the poison within her system which came from the attempted drug-induced homicide. The doctor gave the plaintiff a phony pap smear and told the plaintiff to call for her results. He also gave the plaintiff her release form with a phony telephone number on it to call for results. The number stated to press #1 for the dentist and maybe #2 or #3 for prenatal care. Several days later, the plaintiff came back to the emergency room to ask about her results; however, there were no results and another physician gave her a prescription to get a yeast infection pill from the pharmacist.

**775 ILCS 5/1-102 (B) Freedom from Sexual Harassment-Employment and Higher Education.** To prevent sexual harassment in employment and sexual harassment in higher education. **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the

basis of race, color, sex, national origin, disability or religion. **720 ILCS 5/11-9 Public Indecency.** (a) Any person of the age of 17 years and upwards who performs any of the following acts in a public place commits a public indecency: (1) An act of sexual penetration or sexual conduct as defined in Section 12-12 of this Code; or (2) A lewd exposure of the body done with intent to arouse or to satisfy the sexual desire of the person. Breast-feeding of infants is not an act of public indecency. (b) "Public place" for purposes of this Section means any place where the conduct may reasonably be expected to be viewed by others. (c) Sentence. Public indecency is a Class A misdemeanor. A person convicted of a third or subsequent violation for public indecency is guilty of a Class 4 felony. **720 ILCS 5/11-20 Obscenity.** (a) Elements of the Offense. A person commits obscenity when, with knowledge of the nature or content thereof, or recklessly failing to exercise reasonable inspection which would have disclosed the nature or content thereof, he; (1) Sells, delivers or provides, or offers or agrees to sell, deliver or provide any obscene writing, picture, record or other representation or embodiment of the obscene; or (2) Presents or directs an obscene play, dance or other performance or participates directly in that portion thereof which makes it obscene; or (3) Publishes, exhibits or otherwise makes available anything obscene; or (4) Performs an obscene act or otherwise presents an obscene exhibition of his body for gain. **720 ILCS 5/33-3 Official Misconduct.** A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he commits any of the following acts: (a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or (b) Knowingly performs an act which he knows he is forbidden by law to perform; or (c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority; or (d) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not

36

authorized by law. A public officer or employee or special government agent convicted of violating any provision of this Section forfeits his office or employment or position as a special government agent. In addition, he commits a Class 3 felony. **720 ILCS 5/ 26-1. Disorderly Conduct.** a) A person commits disorderly conduct when he knowingly: (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. *Francine Yates v. The Chicago Transit Authority, 2004CF2159 21BA41078.* (See Exhibits in Appendix Section)

### Charge 7: Harassment/Basis: Retaliation = Disability & Opposing Unlawful Discrimination

In 2004, 2006 and 2007, the plaintiff engaged in the protected activities of complaining about unlawful workplace discrimination. Also, on June 13, 2008, the plaintiff placed a call to the FBI under the direction of Patrick Fitzgerald's office. She complained about fraud, embezzlement, coercion, harassment, sexual harassment and police intimidation. The retaliation consisted of the following acts: **1.)** Angela King, (CTA employee in Capital Investment), mocking the plaintiff by stating and making physical references with the use of her hand in CTA's work environment that the plaintiff was crazy; **2.)** Angela King stating that the plaintiff has paranoia and directly conspiring with management to diagnose the plaintiff with the disease in an effort to separate her from CTA; **3.)** Sedgwick CMS and Unicare Health Insurance engaging in fraud by aiding and abetting; **4.)** Sedgwick CMS engaging in fraud by allowing fraudulent contracts to be used in employment practices; **5.)** Sedgwick CMS engaging in fraud by allowing one federal benefit to be cut and pasted over another benefit in an effort to defraud the plaintiff; **6.)** not notifying the plaintiff within a timely manner that her time off was being designated as FMLA time; **7.)** Sedgwick breaching their contract and fiduciary responsibilities; **8.)** Unicare Health Insurance not wanting to pay out the plaintiff's medical liabilities; **9.)** Unicare Health Insurance denying

South Surburban Hospital the right to collect on a claim when the plaintiff was fully covered by Unicare's Health Insurance; **10.)** not allowing the plaintiff to return to work on April 27, 2004 when her physician released her to return to work without any work restrictions or limitations; **11.)** the Chicago Transit Authority not calling Unicare to have the COBRA forms sent to the plaintiff, the federal law states that the employer's responsibility is to call and have the forms sent directly for the plaintiff; *12.)* sending the plaintiff between 150 and 300 pieces of junk mail every day since November 17, 2008, as of the date of the filing of this case, some emails continue to flow; **13.)** sending police officers to stalk, belittle & harass the plaintiff because she was homeless & because of her disabilities; **14.)** sensoring the media by printing an ad between June and July about a nurse who was falsely arrested and won a lawsuit for 7.7 million, printing an ad about the Latin King gangs involved with a homicide next to the nurse's ad, this was done to mock the plaintiff because Ronald Huberman had placed a tap on her telephone; **15.)** mocking the plaintiff about being homeless, having impacted wisdom teeth and the diarrhea she experienced from the poison by having preachers at the PGM facility preach the plaintiff's life; **16.)** aiding, abetting and obstructing justice through the removal of DePaul University's computers within their alumni lab and replacing them with new computers, the plaintiff discovered that the computers had been changed after she contacted the media, the plaintiff deleted a lot of the emails because she thought it was a joke in the beginning and she was also in denial that something like this could be happening to her, also the plaintiff was suffering from extreme anxiety and depression; **17.)** gaining illegal access to the plaintiff's medical files from Stroger's hospital; **18.)** gaining illegal access into the plaintiff's storage lockers; **19.)** having a male doctor examine the plaintiff in the emergency room at Stroger's hospital by pulling back the plaintiff's inner and outer labia flaps around her vagina with his hand in an effort to insert a

metal object for a pap smear, the plaintiff complained to the doctor about a stomach ache; she thought she might have still been ill from the poison within her system which came from the attempted drug-induced homicide; **20.)** having the doctor in the emergency room at Stroger's hospital give the plaintiff a phony pap smear, the doctor told the plaintiff to call for her results, the plaintiff came back to the emergency room to ask about her results, there were no results and another physician gave her a prescription to get a yeast infection pill from the pharmacist; **21.)** having the doctor in the emergency room at Stroger's hospital give the plaintiff her release form with a phony number on it to call for results, the number stated to press #1 for the dentist and maybe #2 or #3 for prenatal care; **22.)** illegally wire tapping the plaintiff's home telephone (708) 841-5612; **23.)** illegally wire tapping both of the plaintiff's cellular telephones (312) 351-5635; **24.)** illegally wire tapping the plaintiff's girlfriend telephone (773) 737-6451; **25.)** having the arresting officers harass and sexually harass the plaintiff while she was being processed; **26.)** having Patrick Quefurth at the Independent Police Review board report on the plaintiff, aid and abet; **27.)** having internal affairs trash the first investigation that the plaintiff filed against the police officer with the alias of Miriam Martinez; **28.)** having a white, female employee by the name of Nancy from the Appellate Court aid and abet by coming to Robert Morris College on three days during the week ending August 2, 2008 and again on August 9, 2008 to use the computers when she possibly could have been there to watch the plaintiff, also another black male employee watched the items that the plaintiff requested out of her file and possibly reported on her, having a black female and a white, fat female employee tell the plaintiff on August 4, 2008 that she could not make any copies from her appellate file because the case was closed; **29.)** having the plaintiff falsely arrested; **30.)** charging the plaintiff with a battery that she did not commit; **31.)** arresting the plaintiff on her birthday, having officer Melchor mock the plaintiff

about her weight and the fact that it was her birthday; 3*2.)* detaining the plaintiff in jail without just cause; **33.)** intentionally keeping the plaintiff homeless; **34.)** bribing the police officers and the Appellate Court judges to obstruct justice; **35.)** trying to coerce the plaintiff into embezzling and laundering money; **36.)** trying to steal the plaintiff's damages from her first lawsuit; **37.)** mocking the plaintiff by having Lydia illiams at the IDHR call the plaintiff in November 2004 to ask the plaintiff what she was looking for in the form of damages to settle the suit, but not giving the plaintiff anything; **38.)** mocking the plaintiff by having Lydia Williams at the IDHR tell the plaintiff that she did not have a right to ask that the harassers be disciplined when she called the plaintiff in November 2004 to ask about a settlement; **39.)** mocking the plaintiff by having Lydia Williams at the IDHR tell the plaintiff that the defendants were not going to give her the job back; **40.)** placing the green leg of an endangered spieces in the plaintiff's path; **41.)** the judge at the Harrison/Kedzie court house telling the plaintiff that he did not care when she mentioned that she was a law student and that she was falsely arrested for not embezzling money for Mayor Daley; **42.)** the judge at the Harrison/Kedzie court house changing the stay of leave from 162 to 120 days when he could have dismissed the case altogether; **43.)** allowing a fake battery charge to interfere with the laintiff's new job that she was going to start at Motorola; **44.)** having PGM's staff and homeless guests watching, following and listening to the plaintiff's conversations; **45.)** having Yolanda, an employee with the Illinois Department of Human Rights, remove a document from the plaintiff's file in October 2007 when she went to retrieve it from her IDHR file; the document was related to the disability extension benefit that CTA's board was in a position to offer the plaintiff; however they never did; **46.)** having police officers not assist the plaintiff in making an arrest; **47.)** having police officers stare and surround the plaintiff on June 30, 2008 when she came to retrieve a copy of the police report; **48.)** telling the plaintiff in

40

October 2008 that she could not review her file and retrieve copies when CTA knew she was advocating for herself; **49.)** having a group of Appellate court judges deny the plaintiff's case for no valid legal reason; **50.)** forbidding the plaintiff from receiving her telephone messages from two friends prior to Christmas, this was done in an effort to keep the plaintiff from leaving PGM so that the denial letter from the appellate brief could be given to her on Christmas eve; **51.)** giving the denied appellate court letter to the plaintiff on Christmas eve when the case was denied two weeks prior to Christmas; **52.)** placing a note on the telephone board telling the plaintiff to help put the Mayor's enemies to flight; **53.)** illegally gaining access inside the plaintiff's storage lockers; **54.)** conspiring to have the plaintiff engage in racketeering, **55.)** when the plaintiff called 911 in 2003 on Ron Durr, a CTA employee, for blocking her path, the officers, (a white male and a white female) did not give the plaintiff a police report nor did they arrest the employee who was blocking the plaintiff's path, this was an act of sexual harassment as well as the threat to do bodily harm to the plaintiff, and also another continued violation for the City of Chicago with its police officers; **56.)** contesting the plaintiff's right to receive unemployment benefits when CTA involuntarily separated the plaintiff from service; **57.)** towing the plaintiff's car in October 2007 after she complained about Mayor Richard Daley; **58.)** having others in public use scare tactics to test the plaintiff's level of fear and homophobic tendencies; **59.)** having a city employee to give the plaintiff a bag with about 25 rolls of toilet paper in it; **60.)** giving the police officers the plaintiff's personal information; **61.)** trying to use the plaintiff as a scapegoat because she has clean credibility; **62.)** having Nassira Tokash carry a pink razor blade and a blackberry on the night of May 25, 2008. The defendant's adverse actions followed the plaintiff's protected activities within such a reasonable period of time, directly raising the inference of retaliatory motivation. **The Title VII Civil Rights Act of 1964** states that an

employer may not fire, demote, harass or otherwise "retaliate" against an individual for filing a charge of discrimination, participating in a discrimination proceeding, or otherwise opposing unlawful discrimination. Retaliation occurs when an employer, employment agency, or labor organization takes an adverse action against a covered individual because he or she engaged in protected activities. **Title I of the American with Disabilities Act** states that it is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding or litigation under the Americans with Disabilities Act. *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 1-06-3107.* (See Exhibits in Appendix Section)

### Charge 8: Defamation of Character

Defamation of character is a false and unprivileged spoken word or written publication which exposes any living person to hatred, contempt, ridicule, or which causes him/her to be shunned or avoided, or which has a tendency to injure him/her in his/her trade or occupation. The plaintiff; Francine Y., is a public service official because she worked in the Capital Investment office of the Chicago Transit Authority. Because of her disabilities, the statute of limitations have been tolled on the case that she filed against the Chicago Transit Authority, the City of Chicago and the Illinois Department of Human Rights. Francine Y. expects to win her case and return to work as a public service official. The plaintiff opposed unlawful discrimination and engaged in the protected activity of complaining about harassment, sexual harassment and retaliation in 2004, 2006 and 2007. In November 2007, Ronald Huberman, Mayor Richard Daley and Governor Rod Blajeovich conspired and tried to get the plaintiff to embezzle and launder money for them by attaching millions of dollars to her lawsuit settlement.

Francine Y. refused to engage in fraud at the request of the defendants. As a result, Ronald Huberman gave verbal and/or written instructions to Nassira Tokash as well as other police officers and members of PGM's staff that he was going to have the plaintiff falsely arrested. Those instructions and performed acts of fraud will injure the plaintiff's reputation as being a public service official and a future high-powered U.S. Attorney. They will also affect the way she is perceived by others.

On May 26, 2008, the plaintiff; Francine Y., was staked out by four Chicago police officers and demanded to get into the officer's car. Rhonda Davis and Kenyatta; women living at PGM's homeless mission, actively and willfully participated in the false arrest. Francine Y. was held in contempt and defamed as being a criminal because Nassira Tokash filed a fraudulent domestic battery charge against the plaintiff. The charge stated that Francine Y. physically assaulted Nassira Tokash on her upper body. This is a blatant lie because Francine Y. never physically assaulted anyone on May 26, 2008. The plaintiff was falsely arrested, finger printed, given a criminal profile, falsely imprisoned and intentionally detained within a correctional facility for a crime which she never committed. Nassira Tokash offered no substantial evidence as proof that the domestic battery did in fact occur. There were no complaining witnesses that positively identified the presupposed suspect nor was there any expert eyewitness testimony to corroborate Nassira Tokash's false claim. Also, the plaintiff was staked out after she left PGM's homeless mission alone in an effort to apprehend her without any witnesses. The arrest was calculated and the timing of the event was made with precision. The arresting officers refused to give the plaintiff a copy of the police report and the name of the person which made the false allegations and complaint against her. Nassira Tokash disguised her identity as a homeless woman through

43

the use of perpetration, identity theft, identity cloning and forgery. About two weeks following the premeditated false arrest; on June 9, 2008, Nassira Tokash passed the plaintiff while she walked down the same sidewalk on State street as the plaintiff. As officer Tokash crossed the plaintiff's path, she veered to the very edge of the sidewalk, as if she was avoiding a fat, dangerous, black, mentally ill criminal that would inflict harm upon her. Nassira Tokash also tried to defame the plaintiff as being someone that had a hygiene problem. The officer shunned the plaintiff and made statements that the plaintiff needed to change her pants while living in PGM's homeless facility. This was done as an act of retaliation and defamation because Francine Y. emailed Ronald Huberman to let him know that the other officer, Miriam Martinez, would not shower or wash her hair while living in the PGM homeless facility. Francine Yates wore the same pants more than one day out of the week because it was convenient, she was not sexually active, she did not want to get into confrontations with the staff over clothing and because she was truly homeless. The plaintiff washed her clothes at the laundromat when she had money and at her friend's house when she did not have money. Also, PGM made the homeless guests place their clothes in a hot box every night in an effort to sterilize the clothing. The clothes were steamed at pressures above three hundred degrees Fahrenheit. This process made the clothes fresh everyday. The plaintiff has seen officer Tokash wear the same underwear on a daily basis as well as wear her jeans on a consecutive daily basis. This information is relevant because the plaintiff is homeless and the officer was just a perpetrator. Nassira Tokash ostracized the plaintiff and caused her to become exposed to hatred. She also reported this information to Ronald Huberman because he sent the plaintiff junk emails pertaining to washers and dryers which ridiculed and harassed her. As a result, this act of defamation could potentially hurt the plaintiff's credibility when she returns to work, causing her to become ridiculed,

44

belittled and rejected. Francine Y. became deeply wounded, offended and severely humiliated by the way the police officers, PGM's staff and some of the homeless guests were treating her based on directions and instructions given to them by Ronald Huberman.

Another act of defamation occurred when Ronald Huberman gave PGM's staff verbal instructions to send the plaintiff to Stroger's hospital after she complained about the verbal and physical abuse that Barbara Rawlings subjected her to. After the plaintiff came from Stroger's hospital, Barbara Rawlings ridiculed her by stating that she was crazy. The plaintiff is not sure how Barbara Rawlings received her protected health information. Francine Y. was defamed as being psychotic because she opposed unlawful discrimination. Lastly, officer Miriam Martinez slandered the plaintiff's name between December 2007 and January 2008 by stating in front of others that the plaintiff was Ronald Huberman's lover, the fact that they both had green eyes and that they would have a green-eyed baby. This is a blatant lie because Francine Y. has never met Ronald Huberman personally and the plaintiff has not been sexually active for a number of years. The plaintiff perceived the officer to be saying that she was a prostitute or possibly a desperate woman who was sleeping with any man that she could find. This act of slander could hurt the plaintiff by her being ridiculed and mocked about the rumor that she is seeing someone who is perceived as being a homosexual. The slander could also cause her to become shunned and avoided by others. Lastly, the slander could greatly damage the plaintiff's career because Ronald Huberman has been personified and perceived as being "THE MAFIA." Ronald Huberman is also a part of Mayor Daley's entourage. A fat, black male police officer has been spreading rumors at the Mexican bazaar on 12th street that Ronald Huberman's father is the head of the CIA in Israel and that Ronald Huberman is "big time" gay. The plaintiff does not have any

political or personal ties with Mayor Daley and his entourage. She intends to remain unattached to anyone associated with Mayor Daley's administration. Francine Y. became deeply wounded, offended and severely humiliated by the way Ronald Huberman, the police officers, PGM's staff and some of the homeless guests were treating her. These acts of defamation were intentional, reckless and done with malice. As a result, the plaintiff's anxiety and depression heightened. She also became severely traumatized.


Paul Fish placed a memorandum in the plaintiff's permanent employment file and it stated that the plaintiff's co-workers were afraid of her, that she was causing the work environment to deteriorate and making irrational outbursts directed at her co-workers. These are blatant lies. Because Paul Fish and Dr. Kumar Moolayil intentionally perceived the plaintiff to be afflicted with paranoia, Francine Y.'s character was defamed. Their written and/or verbal instructions made others treat her as if she was a dangerous criminal. When the plaintiff returned to work on June 3, 2004, Angela King and Alana Bates were given special permission to be removed from the office as if Francine was going to cause harm to them. They shunned and avoided the plaintiff because of the fraudulent written and verbal instructions that were made regarding the plaintiff. The Chicago Transit Authority authorized two male security guards to escort Francine Y. off of CTA's premises as if she was a violent criminal. The John Marshall Law School perceived the plaintiff to be dangerous because they referred her to security after she disclosed her disabilities and opposed unlawful discrimination. Lastly, a John Marshall Law School employee; Olga, walked past the plaintiff and perceived her to be dangerous. This was evident because when she passed the plaintiff, Olga walked on the edge of the sidewalk in an effort to avoid the plaintiff as if the plaintiff would cause her bodily harm.

A principle difference between working in an occupation and practicing a profession is the fiduciary responsibility that comes with that profession. A fiduciary is a person or group of people who stand in a position of trust. That trust represents a significant obligation to care for the interests of others. Inherent in practicing as Presidents, Mayors and Governors is the fiduciary responsibility that authoritative persons or a group of persons in charge accept, placing the interests of others above themselves. An agent is a person or group of persons who perform an act for another. Inherent in this act is fiduciary responsibility and dual agency, which can also be referred to as mixed agency. This is a situation where a person/authoritative figure performs or acts for two others. The two people involved are the employee and the entity the agents are employed with. President Ronald Huberman, Mayor Richard Daley, Governor Rod Blajeovich and the police officers which aided and abetted failed as agents acting on behalf of City of Chicago and the State of Illinois. They did not fulfill their fiduciary responsibilities to the plaintiff; Francine Y., or to the state and local governments. Their intent to outwardly deceive, inflict pain and break the law was intentional and deliberate. It was also done with malice. They placed their own interests above the interests of an innocent, mentally ill, homeless, African-American, Christian woman. They were skilled in the law, but took no measure to use the law to protect, defend or assist the plaintiff. The plaintiff; Francine Y., needed their help more than anything else.

The Chicago Transit Authority, the City of Chicago and the State of Illinois also committed the workplace torts of intentional infliction of emotional distress, intentional infliction of mental distress and negligent intentional infliction of emotional and mental distress upon the plaintiff. A reckless disregard for the likelihood of causing the plaintiff distress occurred when the

47

plaintiff was falsely arrested and falsely imprisoned for no valid legal reason. The plaintiff, Francine Y., was outraged when she discovered that she was being arrested for fraudulent reasons mixed with the intent to conspire against her. Francine Y. was vulnerable because she was a woman who was mentally disabled, homeless and without legal representation. The defendants were aware of all of these facts. The defendants were in a position of power, so they tried to take advantage of the plaintiff. Lastly, the CTA, the City of Chicago and the State of Illinois owed the plaintiff the fiduciary responsibility and duty of giving her a chance to tell her side of the story during the arrest, provide eyewitness testimony and receive a copy of the complaint that was filed against her. The plaintiff was intentionally ignored. These actions, subsequent actions, and all other actions that followed made the plaintiff's emotional and mental distress greater than it was from the beginning. The plaintiff became deeply wounded, humiliated and severely traumatized. Francine Y.'s depression and anxiety became worse when she was involuntarily detained within a correctional facility through the use of force by four police officers that staked her out and staged the false arrest. Francine Y. also became mentally exhausted due to other tense circumstances surrounding the false arrest. *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*    *(See Exhibits in the Appendix Section)*

**735 ILCS 5/13-201  Defamation - Privacy.** Actions for slander, libel or for publication of matter violating the right of privacy, shall be commenced within one year next after the cause of action accrued. **The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for:  **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military

service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State. **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970. **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **The 1970 Illinois Constitution states in Section 20: Individual Dignity.** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. *(See Exhibits in Appendix Section)*

### III. CONCLUSION

The plaintiff, Francine Y., was intentionally discriminated against by the Chicago Transit Authority, the City of Chicago and the State of Illinois, Sedgwick CMS and Unicare Health Insurance because she opposed unlawful discrimination. The parties' intent to do so was reckless, malicious and overwhelmingly destructive. The defendants were all in a position of power. They knew the plaintiff was a homeless, mentally disabled, single, African-American, Christian woman without effective legal representation. As a result, they took advantage of the

plaintiff as well as the situation. However, the plaintiff took a stand in the face of adversity and opposed unlawful discrimination, enduring a great deal of persecution. They were in a position of power, fully enabled to help the plaintiff; however, they chose to break the law by intentionally ignoring the plaintiff's complaints, violating her rights, aiding, abetting and obstructing justice. This case should be an embarrassment, a shame and a disgrace to the Chicago Transit Authority, the City of Chicago, the State of Illinois, Sedgwick CMS, Unicare Health Insurance as well as all other accomplices.

Francine Y.; the plaintiff, is asking for a summary judgment to be rendered in favor of the plaintiff with no appeals granted on behalf of the defendants. The plaintiff is also seeking relief from the district court in the form of the following remedies: injunctive relief, all harassers to be disciplined and separated from service, permanent disbarment, damages for mental anguish/mental cruelty, psychological & emotional pain from suffering, shame, indignity, disgrace, embarrassment, humiliation, demoralization, anger, discomfort, inconvenience, delay, worry, distress, anxiety, stress, malice, oppression, conscious indifference, willful indifference, deep depression, homelessness & side affects, feelings of sorrow, torment, powerlessness and exclusion, future continued indefinite suffering, damages for intentional infliction of emotional and mental distress, damages for negligent intentional infliction of emotional and mental distress, damages for a diminished quality of life, loss of opportunity potential, attorney fees, expert witness fees, punitive damages, pecuniary/non-pecuniary damages, reimbursement of all fees, all workplace torts, damages for fraud & conspiracy to commit fraud, all actions enabling the plaintiff to be made whole.

*Francine Yates*
FRANCINE YATES

## PROOF OF SERVICE

I, the undersigned plaintiff, certify that on the _____ day of _____, _____, I served a copy of this _____ to each person to whom it is directed by way of _____.


The Chicago Transit Authority
Attn: Ronald Huberman
567 W. Lake Street
Chicago, IL 60661

The City of Chicago
Attn: Mayor Richard Daley
121 N. LaSalle Street
Chicago, IL 60602

The State of Illinois
Attn: Rod Blajeovich
100 W. Randolph Avenue
Chicago, IL 60602

Sedgwick CMS
Attn: Legal Department
P. O. Box 803947
Chicago, IL 60680

Unicare Health Insurance
Attn: Legal Department
233 S. Wacker Drive
Suite 3900
Chicago, IL 60606


*Francine Yates*

Francine Yates, Pro Se
14114 S. Edbrooke Avenue
Riverdale, IL 60827
(312) 351-5635

# APPENDIX

This disability notice must be filled out immediately. Return to Sedgwick CMS, P.O. Box 803947, Chicago, IL 60680-3947. I duty to notify your immediate supervisor on your first day off. On your second day off, notify your work location and Sedgwic (312) 759-2282.

**ATTENTION:**         Your claim benefits will not start until you are under the care of a licensed provider.

**\* IMPORTANT:**         This form is not to be used if sickness or injury is due to an injury on duty or recurrence of same.

## BOTTOM PORTION MUST BE COMPLETED BY LICENSED PROVIDER

Name _YATES, FRANCINE_                    N/A
Last / First / Middle / Married

Address _15439 S. DORCHESTER, UNIT #2F    DOLTON ZL 60419    (708) 841-5612_
Number / Street / City/Town / Zip Code / Phone Number

Age _35_  Occupation – Type of Work _FINANCIAL ANALYST 3_    Badge/Payroll Number _41648_    Social Security Number _345-602-1580_

Department _CAPITAL INVESTMENT_    Location _222 Merchandise MART Plaza Chicago ZL_    Union 7 NA PLEXEMPT company

Describe Type of Sickness or Injury _MAJOR DEPRESSION AND ANXIETY_    Injured on Duty _YES_

First Day Unable to Work _Wednesday 11/26/03_
Month / Day / Year

Name of Provider Attending _KUMAR MOOLAYIL_    Phone Number _(708) 596-5622_

Address _15425 S. PARK #102    South Holland, IL 60473_
Number / Street / City/Town / Zip Code

---

To be completed by Employee
AUTHORIZATION TO RELEASE INFORMATION: I hereby authorize the undersigned provider to release any information acquired course of my examination or treatment to the CTA's Medical Director, Sedgwick CMS, Blue Cross/ Blue Shield and ComPsych to rele CTA information necessary for the payment of Weekly Indemnity Benefits.

Signed _Francine Yates_        Date _12/7/03_

---

TO BE COMPLETED BY LICENSED PROVIDER IMMEDIATELY AND RETURNED TO SEDGWICK CMS, P.O. BOX 803947, CHICAGO, ILLINOIS 60680-3947

Patient's Name _FRANCINE YATES_

First day evaluated for present condition _12/2/03_

Diagnosis/ Presenting Issue _Major depression and anxiety_    ICD 9 Code _296.23_

Surgery (if applicable include date)

Treatment Plan (including meds) _Klonopin 0.5 mgm po BID / Lexapro 10mg po QD_

What symptoms are preventing the patient from returning to work? _anxiety / depression / difficulty being around people_

Duration of disability? _approximately 12 wks._

Next Office visit date (if applicable) _12/29/03._

Signed _Kumar Moolayil_        MD.

Date _12/15/03_

\* Provider Name: _KUMAR MOOLAYIL_
\* Provider Address: _15475 S. PARK #102 S. Holland IL 60473_
\* Provider Phone Number: _708 596 2211_    \* Provider Fax Number: _708 596 5622_

EXHIBIT A

DEPARTMENT OF EMPLOYMENT SECURITY
14829 DIXIE HIGHWAY
HARVEY, IL 60426

DATE: 10-09-2004 SSN: 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

FRANCINE  YATES
15439 S DORCHESTER
DOLTON # 1F, IL 60419                    EMP:C.T.A. MERCHANDISE MART PLAZA

### NOTICE OF LOCAL OFFICE INTERVIEW
### IMPORTANTE NOTICIA DE UNA ENTREVISTA EN LA OFICINA LOCAL

A question has been raised regarding your eligibility for unemployment
insurance benefits for the period beginning 05-30-2004.  To resolve
this question, it will be necessary for you to be interviewed
and to supply information regarding your inability to and/or unavailability for
work.  Section 500C of the Illinois Unemployment Insurance Act applies to your
eligibility in this case.  This interview is requested because YOU HAVE BEEN
SCHEDULED FOR AN INTERVIEW IN REGARDING TO YOUR AVAILABILITY FOR WORK.  PLEASE
CERTIFY WITH THE TELE-SERVE. .  At the time of your interview, you should be
prepared to present any information you have regarding your case.

YOU HAVE BEEN SCHEDULED TO BE INTERVIEWED IN PERSON AT OUR OFFICE ON:  10-15-2004
at 12:15 PM.  If a questionnaire is enclosed with this Notice, please have it
completed and signed, and bring it with you when you report.  If you have witnesses
who can provide information helpful to your case, you should bring them with
you when you report.

If you live outside of Illinois, CONTACT THE ILLINOIS DEPARTMENT OF EMPLOYMENT
SECURITY AT THE TELEPHONE NUMBER LISTED BELOW.

This notice is for your protection and is not a denial of benefits. A final determination
regarding your eligibility for benefits will not be made until after you have
had an opportunity to discuss this matter with our office.  Failure to make yourself
available at the time stated above will result in a determination being made
on the basis of information then available to the Claims Adjudicator.  YOUR BENEFITS
MAY BE SUSPENDED, TERMINATED OR RECOUPED.

IF YOU EXPECT TO BE WORKING, OR FOR ANY OTHER GOOD REASON, YOU WILL NOT BE AVAILABLE
FOR THE INTERVIEW, COMPLETE THE ENCLOSED FORM AND MAIL IT TO THIS OFFICE TO RESCHEDULE
YOUR INTERVIEW.

Esta noticia es para avisarle que hay una duda sobre su eligibilidad para seguro
de desempleo.  Para aclarar esta duda usted puede hablar por telefono a la hora
y el dia antes mencionados o' presentarse a esta oficina para una entrevista
en la fecha y la hora indicada.  Faltar a entrevistarse por telefono o' en persona
resultara' en una determinacion basada en la informacion al corriente y puede
afectar sus beneficios de desempleo.  Sus beneficios pueden ser suspandidos,
terminados o' devueltos en base lo indicado arriba. Si Ud. esta tranbajando en
la fecha y la hora indicada, complate esta trajata y enviela por correo a la
oficina tan pronto le sea posible.

**E.S. Service Representatives - 150**
**Adjudication Department**
**Phone 708-596-2325 Ext.          Fax 708-596-5351**

Exhibit B

YOUR RIGHTS AS A CLAIMANT

1.  Your unemployment insurance benefits will not be suspended or terminated
until a fact finding interview has been conducted and a written decision has
been mailed to you. If the decision is favorable to you, your benefits will not
be suspended or terminated. If the decision is made against you, your benefits
will be suspended or terminated in accordance with the provisions of the Illinois
Unemployment Insurance Act.  However, should you receive a determination of ineligibility
for benefits for any period, you will have the right to appeal to the Referee.
The determination you receive will explain how to file such an appeal.

2.  If the Claims Adjudicator determines that you are ineligible for benefits
which you have already received, a recoupment decision will be issued in accordance
with Section 900 of the Illinois Unemployment Insurance Act.  No benefits will
be recouped until the expiration of the time for filing an appeal or, if an appeal
has been filed, until the decision of a Referee has been made affirming the determination
of the Claims Adjudicator.

3.  You may be represented by an attorney or a legal representative during your
interview.  A friend or other person may also help you present the facts.   If
you cannot afford a lawyer, you may contact your local legal aid society or legal
assistance program for help.

4.  In order that you have sufficient time to prepare your case, this interview
has been scheduled at least seven days from the date of this notice.

5.  At the beginning of the interview, the Claims Adjudicator will read to you
the contents of your file which are relevant to your eligibility for benefits.
You will have an opportunity to comment upon that information.

6.  You have the right to have witnesses present at your interview. If your witnesses
cannot appear in person or by telephone, you may submit statements from them
in writing.

7.  Any adverse information offered over the telephone by your former employer
or his employees must be confirmed by the employer or his employees in writing
if it is to be considered.

8.  If you choose to report in person rather than by telephone; you will have
an opportunity to inspect, first hand, the contents of your file; you may inspect
any written information obtained from the employer or other witnesses; and, at
the conclusion of the interview, you will have an opportunity to sign a statement
verifying the accuracy of the information obtained from you.

9.  At the interview, you may request the Claims Adjudicator to have your former
employer produce any documents which relate to your eligibility for benefits
and which will substantiate your claim for benefits.  You may also request the
Claims Adjudicator to ask your employer for any information which will support
your benefit claim.

10.  If any adverse information is obtained by the Claims Adjudicator after the
interview, you will be notified and given the opportunity for another interview
before a determination is made.

WARNING:  The Illinois Unemployment Insurance Act provides for disqualification,
fines, imprisonment and the recovery of benefits from persons who knowingly make
false statements or knowingly fail to disclose a material fact for the purpose
of obtaining unemployment insurance benefits.

DEA # AM8456471

**KUMAR MOOLAYIL, M.D.**
15475 SOUTH PARK AVENUE
SUITE 102
SOUTH HOLLAND, IL 60473
708-596-2211

NAME _Francine Yates_

ADDRESS _____ 5/24/04



EX HIBIT



# Chicago Transit Authority

Merchandise Mart Plaza, P.O. Box 3555
Chicago, Illinois 60654
(312) 664-7200

May 27, 2004

**Administrative Separation**

**Badge #:  41648**

Ms. Francine Yates
15439 S. Dorchester – Unit 1-F
Dolton, IL  60419

## CERTIFIED MAIL – RETURN RECEIPT REQUESTED
## PRIORITY MAIL SERVICE

Dear Ms. Yates:

Due to illness, you have been unable to perform you duties as Financial Analyst III since November 26, 2003.   Your request for Family Medical Leave was denied because you exhausted your FMLA entitlement.    In addition, your Short-term Disability benefit has expired per the parameters of Administrative Procedure # 131.

CTA President Frank Kruesi determined that exempt employees would no longer be placed in Area 605. Therefore, I have no recourse but to administratively separate you from your employment with the Chicago Transit Authority.   Your separation is effective immediately.   Your health insurance may continue under the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985.   You will be eligible for continuation of coverage by paying an administrative fee for this coverage.   You can contact the COBRA administrator Unicare COBRA Billing at (800) 331-8492 for additional information.   In addition, you are eligible for one (1) vacation day.

In regards to any pension benefits, which may be available to you, contact Ms. Gloria Cage at the Retirement Plan office for further information.  She can be reached at (312) 463-0358.  Finally, you can call Paul F. Fish at (312) 664-7200, extension 4590 to make arrangements to return your I.D., security pass and office key, and to obtain your personal effects.

Sincerely,

Paul F. Fish
Vice President
Capital Investment

cc:    Joyce Coleman, Human Resources/Vice President
       Jonathan Johnson, Payroll/ Manager
       Carla Jones, Benefits Services/ Benefits Coordinator
       Employee's Personnel File

*EXHIBIT D*

# MEDICAL EXAMINATION REPORT

To _GM_

Location _____
Room No. _____

Employee _Frederick Yates_　　Employee No. _A1164628_　　Date _4/2/08_

was found physically (un)fit to work as a _3y OLP Analyst_

Type of Examination: _____

Remarks: _Reporting to EAP for_
_proper treatment_

Absent from duty since _____

Signed _____ M.D.

cta 7533 (rev. 10/86) Personnel Administration, Medical

EXHIBIT 11

EXHIBIT E

# Sedgwick CMS

**Sedgwick Claims Management Services, Inc.**
P O Box 803947, Chicago, IL 60680
Telephone 312 356-0001   Facsimile 312 346-0023

May 11, 2004

Francine Yates
15439 S Dorchester Unit 1F
Dolton, IL 60419

RE:  **Employee:**  **Francine Yates**
     **Employer:**  Chicago Transit Authority
     **First Date Absent:**  11/26/2003
     **Claim Number:**  20031116750-
     **Badge Number:**  41648

Dear Ms. Yates:

Sedgwick Claims Management Services administers Short Term Disability (STD) claims on behalf of Chicago Transit Authority.  Short Term Disability benefits are payable to you when you are totally disabled and under the regular care of a Physician.

According to our records, you have been disabled since November 26, 2003 and are being paid STD benefits.  This letter is to advise you that your benefits will expire on May 26, 2004.

Based on your length of service, you may be eligible for disability allowance.  You must contact the Retirement Plan for CTA Employees before to determine your eligibility.

If you have any questions regarding your claim, please feel free to contact us at 312-542-0052.

Sincerely,

Felecia Dus
STD Claim Examiner
Sedgwick Claims Management Services, Inc.

EXHIBIT F



# MEMORANDUM

**TO:**    Francine Yates
        Badge #: 41648

**FROM:**    Paul F. Fish
        Vice President, Capital Investment

**DATE:**    May 27, 2004

**RE:**    **DESIGNATION OF SICK LEAVE**

---

On November 26, 2003 you entered the "Sick Book" for your own serious health condition, which made you unable to perform your job functions. The Acknowledgement of Responsibilities you received from Sedgwick, CMS advised you that the Authority reserved the right to designate your sick time towards your Family and Medical Leave entitlement. The Authority is therefore exercising its rights and designating the "Sick Book" entry as FMLA time for the following periods: November 26, 2003 to February 23, 2004. Accordingly, 60 total days of FMLA leave was used for your own serious health condition.

If you have any questions, please contact me at (312) 664-7200, extension 4590.

cc:    Employee's FMLA file

8423 (02/87)

*EXHIBIT* G